David T. THOMPSON and Thompson Communications Companies, Inc., Plaintiffs–Appellants,

v.

Davor G. GJIVOJE, Defendant–Appellee.

No. 354, Docket 89–7579.

United States Court of Appeals, Second Circuit.

Argued Nov. 22, 1989.
Decided Feb. 20, 1990.

Virginia A. LoPreto, New York City (Edmonds & Beier, New York City, of counsel), for plaintiffs-appellants.

Ann V. Kramer, New York City (R. Mark Keenan, Anderson Kill Olick & Oshinsky, New York City, of counsel), for defendant-appellee.

Before OAKES, Chief Judge, TIMBERS and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

A portion of this appeal turns on the use of the abbreviated Latin phrase "i.e." These letters, generally translated as "that is to say," are like a parenthetical phrase that defines or explains more precisely the words preceding them. Little words sometimes constitute a trap for an unwary draftsman causing a contract to be strictly construed according to its written terms, as we construe it in this case, not broadly construed as the draftsman now claims it should be.

This appeal in a diversity suit involves a dispute over a contract under which plaintiffs, David Thompson (Thompson) and his wholly-owned company, Thompson Communications Companies, Inc. (Thompson Communications or the Company), sold the Company's Networld subdivision to the Company's former president—the defendant, Davor Gjivoje. Thompson Communications provides management and marketing consulting services to the travel industry. Networld was organized to market travel related services of foreign "ground suppliers" to travel agents in the United States. Such suppliers furnish, for example, hotels and tours. Davor Gjivoje was hired by Thompson in December, 1980 to be president of Thompson Communications. When in the first quarter of 1983 the Company experienced financial troubles, Gjivoje approached Thompson saying that although he planned to resign, he was interested in purchasing Networld.

After this conversation the parties entered into two contracts—to be described in a moment—that are the subject of this appeal. After a series of unsuccessful pro-

posals and counterproposals, Thompson and Gjivoje and their lawyers met on April 27, 1983 and—working from a type-written document drafted by Gjivoje prior to the meeting—forged a mutually acceptable contract for the sale of Networld (the 1983 contract).

### A. *The 1983 Contract*

The three-page document drafted and signed on April 27 was divided into four major parts entitled: I. NETWORLD, II. DGG [initials for Davor G. Gjivoje] CONSULTING, III. INVESTMENT and IV. MISCELLANEOUS. This appeal implicates only parts I and II.

Most of the terms for Networld's purchase were set forth in part I. The disputed provision is paragraph five, which reads:

> Networld to pay DTT [initials for David T. Thompson] ⅕th of Networld's annual pre-tax profits (until $300,000 is paid) in exchange for DTT's regular consulting services as will be agreed upon between DGG, on behalf of the new Networld company, and DTT.

As of the filing of this appeal, Gjivoje had paid Thompson $7,000 under this provision for his consulting services. Thompson concedes that Networld has not shown any recorded profits since 1983, but contends that this failure is in part the result of a fraudulent transfer of business from Networld to Networld Communications (NetCom)—a separate company that Gjivoje formed to provide a different service (consulting) than that provided by Networld (marketing services of foreign ground suppliers).

Part II of the 1983 contract, headed DGG CONSULTING, provides the terms for the continuing consulting relationship between Networld and Thompson Communications. This part states insofar as is pertinent:

> DGG [Gjivoje] to continue consulting services for TCC [Thompson Communications] in the Business Development area. DGG and Networld will support all existing TCC business and will not for a period of 6 months from the termination date of this contract pursuant to paragraph 8, solicit or accept business from existing TCC clients (not including Networld clients) except on behalf of TCC, *provided* however, that if TCC fails to make any payment to DGG within 15 days of the due date hereunder then DGG will be relieved of this non-complete agreement if he, for his part, agrees to pay commissions to TCC for any business obtained by Networld from companies who are clients of TCC on the date this agreement is signed in the same amounts and on the same schedule as TCC would have paid DGG under this agreement, such commissions payable to TCC to be reduced by all commissions payable to DGG from TCC.

There follows a subsection, entitled "COMMISSIONS", that lists a schedule of commission percentages for various services.

Plaintiffs claim that the above section requires that Gjivoje and Networld pay commissions to the Company for any business that Networld received from the Company's clients, *regardless* of the manner in which Gjivoje was "released" from the noncompete clause of Part II. In particular, plaintiffs claim that Gjivoje and Networld owe the Company commissions for business it received from a Thompson Communications client, MasterCard, through a separate agreement between them that allowed Networld to assume the MasterCard deal from the Company.

At the time the April 27, 1983 contract was executed, MasterCard was a Company client. Hence, the noncompete clause in the contract would have barred Gjivoje from doing business with MasterCard unless: 1) Gjivoje or Networld had worked as a consultant to the Company on MasterCard business, and 2) the Company had then been delinquent in its payment of commissions to Networld for these services, and 3) Networld decided to take on MasterCard as a direct client, thereby agreeing to pay the Company an equivalent commission to that which Networld would have received had it remained only a consultant. In fact, prior to the transfer of the MasterCard account to Networld, Gjivoje did provide consulting services to the Company

for MasterCard pursuant to the "DGG CONSULTATION" section of the 1983 contract. But because Thompson Communications did not default in . its commissions payments to Gjivoje for his services, the exception to the non-compete clause could not properly have been invoked.

### B. *The MasterCard Agreement*

In order to avoid a possible conflict of interest between MasterCard and some of the Company's other clients, Thompson and Gjivoje agreed to transfer the MasterCard project to Networld. On March 2, 1984 (subsequent to Gjivoje's 1983 purchase of Networld), Gjivoje drafted a letter agreement to be signed by himself and Thompson (the MasterCard Agreement). This written agreement stated:

> This is to confirm that contrary to our agreement of April 1983, you have specifically asked, in the presence of Marion Haller, that I (*i.e. Networld*) take on the Universal voucher project directly with MasterCard and sign with them an agreement to that effect. Under terms which have to be agreed upon separately, TCC is willing to provide the necessary support resources to myself, (*i.e. Networld*) on an as needed basis and upon my request. (emphasis supplied).

Both parties signed this agreement and, thereafter, Gjivoje contracted with MasterCard directly to perform a feasibility study for the Universal voucher proposal. Gjivoje then formed a new company—the earlier referred to NetCom—to handle the MasterCard business, as well as other consulting work. Gjivoje and NetCom consulted on the MasterCard project until it ended in March, 1987.

The parties dispute what effect the MasterCard Agreement language—"contrary to our agreement of April 1983"—has on any obligation Gjivoje may have had to pay Thompson Communications commissions for the MasterCard project. Plaintiffs claim that the language merely released Gjivoje from the non-compete clause of the 1983 contract, but did not release him from an obligation arising under that contract to pay commissions to the Company for *any*

business that Gjivoje received under *any* circumstances from one of the Company's clients. Gjivoje claims, on the contrary, that the MasterCard Agreement language released him from all obligations under the 1983 contract for money earned from the MasterCard deal. Thus, he argues that this money is exempt from having to be included in Networld's profits for the purpose of calculating Thompson's claim to one-fifth of Networld's profits based on the profit sharing provision of the 1983 contract.

### PROCEEDINGS BELOW

On November 13, 1985 Thompson and the Company commenced an action against Gjivoje in the United States District Court for the Southern District of New York (Sweet, J.), alleging three claims for relief: 1) fraud in the inducement of the 1983 contract, 2) breach of the 1983 contract insofar as Gjivoje had failed to pay $293,-000 in profits pursuant to the profit sharing provision, and 3) breach of the investments provision of the 1983 contract, which required Gjivoje to invest at least $100,000 in Networld. In April 1986, plaintiffs filed an amended complaint adding a third breach of contract claim asserting that Gjivoje had failed to pay Thompson commissions, allegedly due under the 1983 contract, for the MasterCard project.

After discovery was completed, Gjivoje filed a motion for summary judgment seeking dismissal of all four claims. Shortly thereafter plaintiffs voluntarily withdrew their fraudulent inducement claim. In an opinion and order filed July 13, 1988, Judge Sweet granted summary judgment dismissing the three remaining breach of contract claims. *Thompson v. Gjivoje*, 687 F.Supp. 922 (S.D.N.Y.1988). With respect to the claim for failure to pay on the profit sharing provision, Judge Sweet found that there was no genuine material issue of fact because the dispute only involved construing the language of the 1983 contract. The district judge ruled that the unambiguous language of that contract only required that Gjivoje pay Thompson one-fifth of *Networld's* profits, and that it was undisputed

720

that Networld had failed to show a profit. *Id.* at 923. But Thompson was granted leave to amend his complaint to allege a claim of fraud in regard to the transfer of the MasterCard account from Networld to NetCom. *Id.*

As to plaintiffs' third claim, the district court found again that there was no issue of material fact as to whether commissions were owed to the Company on the Master-Card project. Looking to the language of the 1983 and MasterCard agreements, the district court concluded that whether or not the MasterCard Agreement relieved Gjivoje of some or all of his obligations under the 1983 contract, the language of that contract did not require Gjivoje to pay commissions to Thompson Communications *unless* it first defaulted in paying Gjivoje commissions for his consulting work, in which case Gjivoje was relieved of the non-compete clause and could take on Company accounts as direct clients. Since it was undisputed that Gjivoje did not assume the MasterCard project under these conditions, the district court found that no commissions were due. *Id.* at 924.

Thompson then, upon leave of the district court, submitted a second amended complaint alleging that the MasterCard account was transferred fraudulently for the purpose of shifting profits from Networld (which was subject to the 1983 contract's profit sharing provision) to NetCom (which was newly created when Gjivoje received the MasterCard account and not subject to the profit sharing provision). Again, Judge Sweet dismissed this complaint, granting Gjivoje summary judgment upon finding that 1) the MasterCard Agreement expressly and unambiguously released the Master-Card account from *all* of the provisions of the 1983 contract, including the profit sharing provision, and 2) since Gjivoje signed with MasterCard directly and assigned the account directly to NetCom, the Master-Card project never became a Networld account, and therefore the profit sharing provision did not apply to it. *Thompson v. Gjivoje*, No. 85 Civ. 8928, slip op. at 9–12, 1989 WL 37650 (S.D.N.Y. April 13, 1989) (LEXIS, Genfed library, Dist. file).

## DISCUSSION

We turn first to the rules governing the use of summary judgment which are familiar and need only be briefly stated. Summary judgment is applicable to all actions and shall be granted if the pleadings and other papers on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). The movant, here Gjivoje, has the initial burden of establishing that there is an absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). All reasonable inferences and any ambiguities are drawn in favor of the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). An alleged or hypothetical factual dispute will not defeat the motion, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986), and where the nonmoving party bears the burden of proof at trial—as plaintiffs do here—it is its burden to come forward to demonstrate that there are issues that must be decided by a factfinder, *see Celotex Corp.*, 477 U.S. at 324–25, 106 S.Ct. at 2553, because they may reasonably be decided in favor of either party. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

Although this appeal reviews two separate summary judgment orders, we discuss plaintiff's claims rather than the separate orders. This is necessary because the claim made in the second amended complaint—alleging that Gjivoje had fraudulently transferred the MasterCard account to NetCom instead of Networld—is closely connected to the first breach of contract claim in the original amended complaint. Thus, for purposes of clarity our discussion will proceed by claim rather than by order.

On appeal, plaintiffs have challenged the district court's dismissal of only two of their breach of contract claims. None of Thompson's fraud or fraudulent inducement claims are at issue. The first breach

of contract claim is that Gjivoje breached the profit sharing provision of the 1983 contract when he failed to assign the MasterCard deal to Networld, and thereby prevented Networld from showing any profits that the MasterCard project may have generated. The second claim is that Gjivoje breached the 1983 contract when he neglected to pay commissions to Thompson Communications for the MasterCard business he obtained under the MasterCard Agreement. We address the commission claim first, and discuss the profit sharing claim second.

### A. *The MasterCard Commissions Claim*

In determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning giving due consideration to "the surrounding circumstances [and] apparent purpose which the parties sought to accomplish." *William C. Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524, 159 N.E. 418 (1927). Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate. *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir.1989). The mere assertion of an ambiguity does not suffice to make an issue of fact. Ambiguity resides in a writing when—after it is viewed objectively—more than one meaning may reasonably be ascribed to the language used. *See Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir.1988); *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 460, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957). Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly. *American Home Assurance Co. v. Baltimore Gas & Elec.*, 845 F.2d 48, 50–51 (2d Cir.1988).

As the district court indicated, plaintiffs' claim that the Company was entitled to commissions from Gjivoje for the MasterCard project is unsupported by any reasonable reading of the two contracts. The MasterCard Agreement itself does not make any reference to commissions; it merely states that Networld is to assume the MasterCard project "contrary to [the] agreement of April 1983." Even if we read this language to have released Gjivoje only from the non-compete clause of the 1983 contract—the reading which Thompson urges—there is still nothing in the 1983 contract that provides for Gjivoje or Networld to pay Thompson Communications any commissions *except* under certain specific conditions. These conditions provide that defendant was forbidden to solicit business from Thompson Communications' clients. If the Company failed to pay Gjivoje for work the latter performed for it, then Gjivoje had the option to take those clients himself, and if he opted to do that he agreed to pay commission to the Company on that business. Only under those conditions does the 1983 contract require Gjivoje to pay commissions to Thompson Communications.

Gjivoje had provided consulting services on the MasterCard project prior to its transfer and accepted MasterCard as a direct client. But he did not acquire the MasterCard project through Thompson Communication's failure to make commission payments to him. Both parties admit that Gjivoje was duly paid his commissions while he rendered consulting services. Instead, Gjivoje obtained the MasterCard project through the MasterCard Agreement, which indicated only that the project would be transferred "contrary to [the] agreement of April 1983." This agreement did not contain a new commissions provision. Therefore, even if parts of the 1983 contract are still controlling Gjivoje had no duty to pay commissions for the MasterCard project.

Plaintiffs argue that the 1983 contract *implies* that Gjivoje is to pay commissions for any accounts he receives from Thompson Communications regardless of the manner in which he receives them. They assert that reading the 1983 contract to require commissions only when the Company has been delinquent in its payments to Gjivoje would eviscerate the non-compete clause,

because under such an interpretation Gjivoje "could violate the non-compete clause with impunity as [the Company] would be without remedy so long as [Thompson and the Company] were current on their obligations."

This argument is wholly unpersuasive. When faced with a violation of the non-compete clause, plaintiffs' remedy is simply to bring an action for breach of contract, not attempt to create a judicially crafted addendum to the contract originally agreed upon. We conclude therefore that the district court correctly found no triable issue of fact concerning plaintiffs' MasterCard commissions claim, and that the order of summary judgment dismissing this claim was properly entered.

## B. *The Profit Sharing Claim*

Plaintiffs' second claim alleges a breach of the profit sharing provision of the 1983 contract when defendant failed to assign the MasterCard business to Networld, foreclosing the possibility of Networld realizing a profit. The profit sharing provision in the 1983 contract required "Networld to pay [Thompson] ⅕th of Networld's annual pre-tax profits (until $300,000 is paid) in exchange for [Thompson's] regular consulting services as will be agreed upon between [Thompson and Gjivoje]." Thompson claims that the MasterCard project should have been assigned to Networld pursuant to the MasterCard Agreement which was drafted by Gjivoje. Thompson contends that if Networld had acquired it, Thompson would have been able to recover some money under the profit sharing provision.

The district court found that the MasterCard Agreement, "in plain terms," rendered the entire 1983 contract inapplicable to the MasterCard project. *Thompson*, No. 85 Civ. 8928, slip op. at 9. We cannot agree. Our reading of the MasterCard Agreement leads us to conclude that it creates a genuine issue of material fact as to whether Gjivoje was precluded from assigning the MasterCard project to NetCom, and was required instead to assign it to Networld.

The district court relied on the language in the MasterCard Agreement that stated:

> This is to confirm that *contrary to our agreement* of April 1983 [the sale contract], you [Thompson] have specifically asked ... that I [Gjivoje] (i.e. Networld) take on the Universal voucher project directly with MasterCard and sign with them an agreement to that effect.

*Id.* (emphasis supplied by the district court). The trial court believed that the words, "contrary to our agreement of April 1983" plainly "makes the sale contract inapplicable to the MasterCard project." Plaintiffs urge that this language only waived the 1983 contract's non-compete restrictions in order to allow Networld to acquire the project without breaching the sale contract. Although we cannot say that plaintiffs' interpretation is more correct than another reading, it strikes us as an entirely permissible construction of the MasterCard Agreement.

The fact that the transfer of the MasterCard project to Gjivoje was "contrary" to the 1983 contract does not require that the transfer *nullified* the entire contract. Reading the MasterCard Agreement, it appears that the parties merely intended to allow Gjivoje to acquire the MasterCard project without breaching the non-compete clause of the contract. It was certainly within their power to agree to do this without invalidating any of the remaining contract provisions. *See Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 354, 429 N.Y.S.2d 715 (modification of contract establishes "a new agreement between the parties which *pro tanto* supplants the affected provisions of the original agreement while leaving the balance of it intact"), *appeal denied*, 51 N.Y.2d 706, 433 N.Y.S.2d 1026, 413 N.E.2d 369 (1980). In any event, the "contrary to" language of the MasterCard Agreement creates a genuine issue of material fact that the district court should not have decided on a motion for summary judgment.

The district judge relied further on a second finding that Gjivoje was not prohibited from assigning the MasterCard project to NetCom, and therefore the profit

sharing provision did not include the MasterCard project because the MasterCard account "never was part of the Networld 'pot.'" *Thompson,* No. 85 Civ. 8928, slip op. at 11–12. Again, the language of the MasterCard Agreement on its face does not support this finding. The agreement states that it is a confirmation by Gjivoje that "I (*i.e. Networld*) take on the Universal voucher project." (emphasis supplied). "I.e.," the abbreviation for the Latin phrase, "id est," is defined as "that is" in *Webster's Third New International Dictionary* (1961). By including the parenthetical, "i.e. Networld," Gjivoje specifically committed the project to Networld. The use of the abbreviated Latin phrase precludes any other interpretation. Because on this point the language of the agreement is clear, the assignment of the MasterCard project to NetCom was a breach of the MasterCard Agreement.

A number of issues remain to be decided before it can be determined whether plaintiffs are entitled to damages. Plaintiffs' damages could be only for money it might have received from Networld's pre-tax profits. Whether the MasterCard project would have created a profit for Networld had it been assigned to that company is a matter of proof at trial. Further, the profit sharing provision in the 1983 contract is itself ambiguous with respect to the stipulation that Networld would pay one-fifth of its pre-tax profits *in exchange* for Thompson's regular consulting services. Hence, on remand, the district court should address these issues to determine whether any money is due plaintiffs under the profit sharing provision.

## CONCLUSION

The order granting summary judgment dismissing plaintiffs' claim for MasterCard commissions is affirmed. The order granting summary judgment dismissing plaintiffs' claim for a share of profits generated by the MasterCard project is reversed and the case is remanded to the district court for a trial of this issue on the merits.

Affirmed in part, reversed and remanded in part.