**ALLIED PRINCESS BAY CO. # 2, Plaintiff,**

v.

**ATOCHEM NORTH AMERICA, INC., Defendant.**

No. CV–91–4146 (CPS).

United States District Court, E.D. New York.

March 30, 1993.

Mark A. Chertok, Sive, Paget & Riesel, P.C., New York City, for Allied Princess Bay Co.

Peter John Sacripanti, Dewey Ballantine, New York City, for Atochem North America, Inc.

### MEMORANDUM AND ORDER

SIFTON, District Judge.

Allied Princess Bay Co. #2 ("Allied") brings suit against defendant Atochem North America, Inc. ("Atochem") on multiple statutory and common law grounds, alleging that defendant is responsible for at least part of the cost of an environmental remediation at a site sold to plaintiff by defendant in 1972 (the "site"). Defendant seeks summary judgment on all of plaintiff's causes of action, and plaintiff cross-moves for partial summary judgment in its favor declaring that defendant is liable for plaintiff's remediation costs. For the reasons discussed below, partial summary judgment is granted in favor of plaintiff; defendant's motion for summary judgment is denied.

By Memorandum and Order dated March 10, 1992 (the "March Order"), the Court granted summary judgment in defendant's favor on all of plaintiff's claims for relief to the extent the relief requested involved payment by plaintiff of sums expended pursuant to a New York State Department of Environmental Conservation (the "DEC") order to clean up the site—costs which plaintiff had agreed to assume by contract. In addition, the March Order granted summary judgment in defendant's favor on plaintiff's private nuisance, trespass, and negligent mis-

representation claims. Familiarity with the March Order is assumed.

Based on the March Order, defendant now reasons that it is entitled to summary judgment on all of its claims because the site can be cleaned up only pursuant to orders from the DEC. Plaintiff, on the other hand, contends that it is entitled to a declaratory judgment that defendant is liable for the costs of remediation at the site under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*

## Background

The following facts are not disputed unless otherwise indicated. Plaintiff filed its complaint on October 24, 1991, setting forth numerous claims for relief. One claim was withdrawn by the plaintiff, and as already mentioned, this Court granted summary judgment in defendant's favor on three other claims. The remaining claims are as follows: (1) a claim based on New York Navigation Law § 181(5), (2) a claim for indemnity under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, (3) a claim for contribution under CERCLA, 42 U.S.C. § 9613(f), (4) a claim of strict liability for conducting an ultrahazardous activity, (5) a negligence claim for causing unreasonable risks to human health and the environment, (6) a claim alleging willful and wanton misconduct in causing these risks, (7) indemnification, (8) contribution, (9) unjust enrichment, and (10) public nuisance.

This action arises out of the sale to plaintiff in 1972 of a twenty-two acre site in Staten Island by defendant's predecessor in interest, Pennwalt Corporation.[1] The sales contract, signed September 14, 1972, included the following assumption provision:

Buyer agrees to take title to the premises under and subject to (i) any notices of violations of law or municipal ordinances,[2] orders or requirements issued on or after the date [of the Contract] by any state or municipal department having jurisdiction over or affecting the Premises.

Contract, ¶ 17.

Over the years, the site has been used for various purposes. From approximately 1881 to 1971, part of the site was used by the S.S. White Co., formerly S.S. White Dental Manufacturing, and its successor the Pennwalt Corporation to manufacture dental equipment. A factory complex where the dental manufacturing occurred was situated in the southern portion of the site. The companies operated a coal burning foundry [i.e., a machine used to melt and cast metal, glass, or plastic], and the site contained storage areas for ash, dust, and coal associated with the foundry.

These operations resulted in the disposal of PAH's (polynuclear aromatic hydrocarbons) on the site. PAH's are classified as a hazardous substance under the relevant regulations and CERCLA. *See* 42 U.S.C. §§ 9601(14), 9602(a); 40 C.F.R. §§ 302.1, 302.4 (table). Coal combustion produces PAH's, which are absorbed on the surfaces of coal ash and this ash was disposed of on the site. Also, moisture causes leaching from raw coal; thus, precipitation or other moisture "leaches" small particles of coal dust containing PAH's from the coal and carries the coal dust to the ground. The soil filters the dust containing the PAH's from the water and the contaminated dust remains in the soil. Further, defendant's predecessors employed injection molding machines to make parts of moldable resin for dental use and used an area in the northeast portion of the site to dump waste plastic parts, some of which contained concentrations of PCB's (polychlorinated Biphenyls) of a type classified as a hazardous substance under the relevant EPA regulations and CERCLA. *See* 42 U.S.C. §§ 9601(14), 9602(a); 40 C.F.R. §§ 302.1, 302.4 (table).

In January 1990, M & T Chemicals and Atochem, Inc. merged into Pennwalt Corporation, and the surviving corporation changed

---

**1.** In January 1990, M & T Chemicals and Atochem, Inc. merged into Pennwalt Corporation, and the surviving corporation changed its named to Atochem North America, Inc., the defendant.

**2.** It is not contended that any "notice of violation of law or ... ordinance" has been issued with respect to the site.

its name to Atochem North America, Inc., the defendant.

After plaintiff Allied bought the site in 1972 from defendant's predecessor Pennwalt Corporation, the site was not used until 1975. In 1975, Allied converted the manufacturing complex into a shopping mall that was active from 1975 until 1983. Some of the businesses in this shopping mall conducted metal fabricating operations, cabinet manufacturing, and printing operations. During this period of time, leaking paint, solvent, and oil cans were observed on the site.

Between 1983 and 1986, the site was not used for any purpose and open to members of the public. A number of the transformers located at the site were vandalized by scavengers, who removed the copper from the transformers and dumped the transformer fluid on the ground.

Also during this period, a fire occurred in a building at the site. The combustion of synthetic and treated construction materials is a potential source of PAH contamination.

In July 1986, plaintiff Allied demolished the buildings and other structures on the site and leveled and covered the rubble with landfill from off site. Because the site was filled with 8 to 10 feet of fill and hazardous substances were detected at depth levels of 0 to 2 feet, there is reason to believe that the fill itself was contaminated.

Starting in the mid–1980's, Allied planned to develop the site for residential use. As part of this planned development and at the behest of the New York City Department of Environmental Protection ("DEP"), Allied hired an environmental consulting firm to conduct an investigation to determine whether there were hazardous substances on the site. This preliminary investigation, which consisted of twelve subsurface and surface soil samples taken from six locations and six groundwater samples, revealed the presence of heavy metals and other contaminants.

After the discovery of the contamination, plaintiff consented to an order of the DEP in July 1988 (the "Order on Consent"), authorized by Article 27 of the New York Environmental Conservation Law. The Order on Consent disclaims any liability on the part of Allied for the contamination or responsibility for any cleanup. Pursuant to the order, Allied conducted more extensive investigation and sampling of the soil and groundwater of the site and prepared a final report describing the findings of the investigation and including a remediation plan for the cleanup of any contamination revealed by the study which would pose a significant risk to human health and the environment. The investigation was conducted in September of 1988 and the final report was issued in March 1989.

The report revealed that the site contained high concentrations of a variety of hazardous substances in both the soil and groundwater, including PAH's and PCB's. Multiple types of PCB's exist and are identified by "aroclors," which reflect the amount of chlorine in different PCB compounds. The type of PCB's found in the soil of the site surrounding the area where S.S. White Co. had dumped plastic waste are the same aroclor of the PCB's found in the plastic waste itself, namely aroclor 1254.

Certain areas of the site are contaminated by PAH's. The areas with the highest levels of PAH's are found on or near the location where the former coal-burning foundry stood; the levels of PAH's decrease with distance from the area where the foundry used to be located.

Because of the level of contamination, DEC listed the site in the Registry of Inactive Hazardous Waste Disposal Sites and classified the site in category "2," a category for sites that pose a significant threat to public health or the environment and at which remediation is required.

## DISCUSSION

Summary judgment must be granted if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of any disputed material facts, *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990), and the court must resolve all ambiguities and draw all inferences in favor of the party against whom sum-

mary judgment is sought. *Id.* Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The showing needed on summary judgment reflects the burden of proof in the underlying action. The court must consider "the actual quantum and quality of proof" demanded by the underlying cause of action and which party must present such proof. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

Therefore, where the ultimate burden of proof is on the nonmoving party, the moving party meets his initial burden for summary judgment by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). To survive the motion, the nonmoving party must then "make a showing sufficient to establish the existence of [the challenged] element essential to [that party's] case." *Id.* at 322, 106 S.Ct. at 2552.

If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, the party opposing the motion must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. To sustain this burden, the nonmoving party may not rest upon the pleadings, but rather must come forward with specific facts to support its claims and show that there is a genuine issue for trial. *Id.*

■ 1. *Defendant's Motion.* The defendant predicates its motion for summary judgment on an argument that, since the site can only be remediated pursuant to order of the DEC, any remediation falls within the assumption provision. The argument must be rejected.

First, the applicable New York statute does not necessarily require that the plaintiff as owner remediate the site, although the law does require that some action be taken by the DEC and authorizes the DEC to require the responsible party to bear the cost of the remediation. *See* ECL §§ 27–1305(4), 27–1313(3)(a) (McKinney's 1984 and Supp 1992).

Article 27 of the New York Environmental Conservation Law addresses the threats posed to the public and the environment by inactive hazardous waste disposal sites. The DEC is charged with enforcement of this regulatory scheme. *New York State Superfund Coalition, Inc. v. New York State Dep't of Environmental Conservation,* 75 N.Y.2d 88, 550 N.Y.S.2d 879, 879, 550 N.E.2d 155, 155 (1989). Under this statute, the DEC maintains a registry of such sites ("Registry") and classifies each site:

> (a) The department shall conduct investigations of the sites listed in the registry.... The department shall, as part of the registry, assess and, based upon new information received, reassess by March thirty-first of each year, in cooperation with the department of health, the relative need for action at each site to remedy environmental and health problems resulting from the presence of hazardous wastes at such sites. In making its assessments, the department shall place every site in one of the following classifications:
>
> ....
>
> (2) Significant threat to the public health or environment—action required;
>
> ....

ECL § 27–1305(4). The site at issue here has been listed under classification "2," and thus "action" on this site is "required."

■ After a site has been classified, the DEC is responsible for developing a remedial program for the site. ECL § 27–1313(1)(a). For sites which pose a "significant threat to the environment," the State Commissioner of Environmental Conservation may order a responsible party to develop a remedial program subject to the approval of the DEC and may order such party to implement the plan:

> Whenever the commissioner finds that hazardous wastes at an inactive hazardous waste disposal site constitute a significant threat to the environment, he may order the owner of such site and/or any person responsible for the disposal of hazardous

wastes at such site (i) to develop an inactive hazardous waste disposal site remedial program, subject to the approval of the department, at such site, and (ii) to implement such program within reasonable time limits specified in the order.

ECL § 27–1313(3)(a). This regulatory scheme does not create a statutory duty incumbent upon the owner of a class "2" waste disposal site to clean up the site absent an order from the DEC or the Commissioner to that effect. In fact, the DEC interprets the statutory scheme to create no such statutory obligation on the part of the owner:

> ECL 27–1313.3 authorizes the Commissioner to order the owner of an inactive hazardous waste disposal site and/or any person responsible for the disposal of hazardous waste at such site to develop and implement an inactive hazardous waste disposal site remedial program for that site. This order creates a duty upon that person to do what the Commissioner orders that person to do. ECL 71–2705.1 provides that any person "who fails to perform any duty imposed by [ECL 27–1313]" shall be liable for civil penalties. There is nothing in the legislative history, caselaw, or the statute itself indicating that the reference to "duty imposed by [ECL 27–1313]" refers to a duty set forth in the express terms of the statute itself. However, the express wording of the statute allows the Commissioner to create a duty to remediate by means of an order to remediate issued under ECL 27–1313.

*Regulatory Impact Statement* (6 NYCRR Part 375), at 7–8 (April 1991) (brackets in original) [Pl.Mem.Ex. B.] Since the DEC is the relevant implementing agency, its interpretation of the statute is to be accorded deference. *See Friends of the Shawangunks, Inc. v. Clark,* 754 F.2d 446, 449 (2d Cir.1985).

In fact, under New York's law a variety of different scenarios is possible after a site has been identified as a class "2" site. For instance, the DEC could act to clean up the site itself if, for example, the Commissioner is unable to locate a responsible party or determine who may be responsible, ECL § 27–1313(5)(b), or if, on weighing the appropriate factors, the DEC decides it is cost-effective for it to do so. ECL § 27–1313(5)(d).

■ Nor does any city ordinance necessarily involve an order requiring Allied to clean up the site. Defendant argues that, under the City Environmental Quality Review ("CEQR") regulations, Allied is required to remediate the site. However, this argument rests on a misunderstanding of the process of environmental quality review under the city's ordinances.

CEQR implements the State Environmental Quality Review Act ("SEQRA") in New York City. CEQR, Executive Order No. 91 of the Mayor of New York, (August 24, 1977). SEQRA requires state and local agencies to prepare environmental impact statements under certain circumstances and to consider these statements in making decisions to approve actions and projects which may have a significant effect on the environment. ECL § 8–0109(2); *see* CEQR § 12. The purpose of SEQRA is to mitigate as much as is feasible the impact on the environment caused by development projects or other actions approved by state or local agencies. *See* ECL § 8–0109(2); CEQR § 12(b) (requiring agency to find that, among the "reasonable alternatives thereto," the approved action "is one which minimizes or avoids adverse environmental effects to the maximum extent possible, including the effects disclosed in the relevant environmental impact statement").

The environmental impact statements must be considered by the appropriate agency in determining whether to extend its discretionary approval to proposed development projects. In the present case, Allied presented its proposed development project to the New York City Board of Estimate ("BOE"). Pursuant to CEQR, the New York City Department of Environmental Protection ("DEP") requested Allied to provide it with certain information and observed that certain remediation efforts would be required if the development project were to go forward. *See* DEP letter dated Sept. 1, 1989 (setting forth "requests" for additional information and "recommendations" for remediation). If Allied does not pursue a develop-

ment plan conditionally approved by the BOE, Allied need not satisfy the environmental conditions of the approval. Thus, any requirements arising under CEQR are not absolute requirements that Allied remediate the site; rather, Allied will incur the duty to undertake such remediation only if it pursues the particular development project approved by the BOE.

■ Defendant argues that the regulations promulgated to implement section 27–1313(3)(a) of the Environmental Conservation Law dictate that remediation can occur at the site only if and when Allied is ordered to remediate the site by the DEC. Defendant relies on the following regulation:

> Except in the event of an emergency, in which event any action taken shall be expeditiously reported to the Department in writing not later than fifteen days thereafter,
>
> (1) no person shall undertake at a site listed in the Registry as a class "1" or "2" any physical alteration that constitutes storage, treatment, or disposal of the hazardous waste the presence of which served as the basis for such listing, unless
>
> (i) such conduct is exempted under subdivision 373–1.1(d) of this Title; or
>
> (ii) such conduct is done with the express written approval of the Department either by a consent order or in such other manner as the Commissioner shall direct.

6 NYCRR § 375–1.2(e) (May 1992) [Def.'s Mem.Ex. E].

Neither side argues that subsection (i) applies, and the plain language of subsection (ii) indicates that the site may be remediated by Allied under the **approval** of the DEC and that this approval need not necessarily be in the form of an "order." As defendant acknowledges, the phrase "in such other manner as the Commissioner shall direct" encompasses orders after a hearing as well as permits or other written agreements. *See Inactive Hazardous Waste Disposal site Remedial Program Hearing Report; Responsiveness Summary; and Revision to Draft Regulatory Impact Statement*, at II–34, II–35 (March 1992); *Regulatory Impact State-*

*ment*, at 8–9 (April 1991). Further, the DEC has clarified its intent in promulgating this regulation as follows:

> The public expressed concern that the regulation (375–1.2: *Prohibitions* ) might discourage or prevent voluntarily [sic] cleanups initiated by responsible parties. Editorial changes were made to this section to clarify the intent. Section 375–1.2[e][1] provides an alternative approach to all voluntary cleanups when the responsible party enters into a DEC consent order **or other agreement.** The Department encourages this action by the responsible party. The conditions contained in the regulation ensure that voluntary cleanups conducted under this approach are done properly, with adequate Department oversight and provide protection of the public health and the environment.

*Assessment of Public Comment: A Summary*, (6 NYCRR Part 375), at 7 (March 1992) (brackets in original) (emphasis added). Thus, this regulation allows for voluntary cleanups conducted in agreement with and under the auspices of the DEC; such a voluntary arrangement not embodied in a consent order cannot be characterized as an "order" or "requirement" issued by the DEC.

■ Finally, defendant argues that, if plaintiff may remediate the site without a DEC order, then plaintiff's complaint should be dismissed because plaintiff's claims are not ripe. However, CERCLA specifically provides for a private cause of action even where the extent of the response costs are uncertain, remediation has yet to occur, and the plaintiff is as yet under no government order compelling remediation. *See Alloy Briquetting Corp. v. Niagara Vest, Inc.*, 756 F.Supp. 713, 719 (W.D.N.Y.1991); *International Clinical Labs v. Stevens*, 710 F.Supp. 466, 472 (E.D.N.Y.1989); *see also Southland Corp. v. Ashland Oil, Inc.*, 696 F.Supp. 994, 1003 (D.N.J.1988) ("Where the facts establishing the right to declaratory relief have already occurred, the case is ripe for adjudication."). Hence, under CERCLA, plaintiff's claims are ripe, and as discussed more fully below, Allied may pursue a declaratory judgment that defendant is liable as a responsible party under CERCLA for plaintiff's response

costs, even if in the long run it turns out that defendant is contractually insulated from liability for the full amount of plaintiff's response costs.

■ 2. *Plaintiff's Motion.* Allied seeks a partial summary judgment in its favor declaring that Atochem is liable under CERCLA for plaintiff's past and future response costs that are not contractually barred. The relevant provision in CERCLA provides in part as follows:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person ... and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
>
> ....
>
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan.

42 U.S.C. § 9607(a).[3]

To prevail on its motion for summary judgment, Allied must show that there is no genuine issue of material fact as to the existence of each of the following five elements of liability under section 107(a) of CERCLA:

(1) the site is a facility; (2) there is a release or threatened release of a hazardous substance at the facility; (3) the release or threatened release caused Allied to incur response costs; (4) the costs and response actions conform to the National Contingency Plan ("NCP"); and (5) Atochem is a covered person in that it fits one of the four classes of responsible parties outlined in section 107(a) of CERCLA. *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992); *Artesian Water Co. v. New Castle County,* 659 F.Supp. 1269, 1278–79 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir.1988). Defendant concedes that plaintiff has established all of these elements, save one: that Atochem fits one of the four classes of responsible parties.

Allied argues that Atochem fits into the second category described in section 9607(a)(2) because S.S. White Co. disposed of plastic parts containing PCB's on the site and the use of coal in the dental manufacturing plant resulted in the disposal of PAH's on the site. Atochem does not dispute the fact that it (through its prior corporate incarnations) previously owned the site and that hazardous substances were disposed of at the site during its tenure. However, Atochem states that, in order to show that Atochem is a responsible party, Allied must show that releases occurred during Atochem's ownership and offers evidence that the contamination, which is the only evidence of such release, resulted from a fire on the site, plaintiff's demolition activities, and other sources.

Atochem's position confuses the concepts of "release" and "disposal." The term "release" is statutorily defined as "spilling, leaking, ... emptying, discharging, ... dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22); *Stanley Works v. Snydergeneral Corp.,* 781 F.Supp. 659, 661 (E.D.Cal.1990). The term "disposal" means "discharge, deposit, injec-

---

**3.** The phrase "from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance" contained in section 9607(a)(4) also conditions subsections (a)(1)–(a)(3). *State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1043 n. 16 (2d Cir.1985). As the Court of Appeals for the Second Circuit has noted, the inclusion of this phrase in subsection (a)(4) is a printer's error; the legislative history shows that the phrase was to have begun on a new line distinct from subsection (a)(4). *Id.*

tion, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment." 42 U.S.C. § 9601(29) (incorporating 42 U.S.C. § 6903(3)); *Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1573 (5th Cir.1988). Section 9607(a)(2) encompasses previous owners of contaminated property who disposed of hazardous substances on the site; as long as the previous owner placed the hazardous substances on the site in such a way that they could enter the environment, the previous owner falls within the ambit of this category. Thus, there need be no showing that, during the previous owner's tenure, the discharged hazardous substances in fact entered the environment, the soil or groundwater, that is, that the hazardous substances were released.

■ Hence, Atochem's position is contrary to the plain language of section 9607(a)(2). The issue of whether the release of the hazardous substance occurred during Atochem's ownership is not relevant in determining whether Atochem is a covered person under this section. *See, e.g., Westwood Pharmaceuticals v. National Fuel Gas Dist. Corp.,* 737 F.Supp. 1272, 1277–79 (W.D.N.Y.1990), *aff'd,* 964 F.2d 85 (2d Cir.1992). Accordingly, Atochem is a covered person under section 9607(a)(2). *See United States v. South Carolina Recycling & Disposal, Inc.,* 653 F.Supp. 984, 993 (D.S.C.1986), *aff'd in part, vacated in part on other grounds sub nom. United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).

■ Defendant's offer of evidence that the source of the contaminants on the site may be plaintiff's activities is also not relevant to the analysis of whether defendant is liable under section 107(a) and thus does not raise a material issue of fact that would bar the summary judgment plaintiff seeks. By proffering this evidence, defendant suggests that there is an issue of fact as to the cause of the soil and groundwater contamination found at the site. However, such a factual causal issue is not material in determining liability under section 107(a).

■ It is axiomatic that CERCLA creates strict liability for the classes of persons described in section 107(a). *B.F. Goodrich,* 958 F.2d at 1198; *State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1044 (2d Cir. 1985); *Dedham Water Co. v. Cumberland Farms Diary, Inc.,* 889 F.2d 1146, 1150 (1st Cir.1989). As the Court of Appeals for this Circuit has specifically held, CERCLA "impose[s] liability on classes of persons without reference to whether they caused or contributed to the release or threat of release" of hazardous substances. *Shore Realty,* 759 F.2d at 1044. In cases where there are multiple potential sources of the contamination, a plaintiff need not prove a specific causal link between the contamination and a particular defendant's waste. *See United States v. Wade,* 577 F.Supp. 1326, 1333 (E.D.Penn.1983); *see also United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 265–66 (2d Cir.1992) (citing *Shore Realty* and *Wade* ); *City of New York v. Exxon,* 766 F.Supp. 177, 194 (S.D.N.Y.1991); *City of New York v. Exxon Corp.,* 744 F.Supp. 474, 480 (S.D.N.Y.1990) (citing *Wade* in the context of section 107(a)(3)); *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 185 (D.C.Mo.1985) (citing *Wade* in context of section 107(a)(2) (previous owner)). Rather,

> the release which results in the incurrence of response costs and liability need only be of 'a' hazardous substance and not necessarily one contained in the defendant's waste. The only required nexus between the defendant and the site is that the defendant have dumped [its] waste there and that the hazardous substances found in the defendant's waste are also found at the site.

*Wade,* 577 F.Supp. at 1333.

In the present case, defendant does not contest the fact that it owned the site at a time when hazardous materials were disposed of there. The plaintiff has shown, and defendant does not dispute, that the plastic waste disposed on the site contained PCB's and that the soil and groundwater has been contaminated with PCB's of the same type as those found in the plastic waste. Additionally, plaintiff has offered evidence, and again

defendant does not dispute, that S.S. White Co.'s use of coal in connection with its dental products manufacturing resulted in the disposal of PAH's on the site. PAH's have contaminated the soil and groundwater of the site. Thus, Allied has established a sufficient nexus between Atochem's waste and the contamination of the site. *See Wade,* 577 F.Supp. at 1333.

After a plaintiff has established its prima facie case, the plaintiff is entitled to a declaratory judgment unless the defendant establishes one of three statutory affirmative defenses. *B.F. Goodrich,* 958 F.2d at 1198. Section 9607(b) provides the only affirmative defenses to a plaintiff's prima facie case of liability. 42 U.S.C. § 9607; *B.F. Goodrich,* 958 F.2d at 1198. Section 9607(b) provides as follows:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused by—
>
> (1) an act of God;
>
> (2) an act of war;
>
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or
>
> (4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b). The burden of raising and proving such a defense rests with the party claiming the defense. *City of New York v. Exxon Corp.,* 766 F.Supp. 177, 195 (S.D.N.Y.1991). Although Atochem pleaded an affirmative defense under section 9607(b) in its amended answer, Atochem cannot rely on its pleadings to defeat plaintiff's summary judgment motion. *See Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56. Atochem has not raised this issue in opposition to Allied's motion and nothing in the current record establishes such a defense.

With two exceptions noted below, Atochem does not dispute Allied's claim that its response costs to date were consistent with the NCP and are therefore recoverable under CERCLA. Two issues are, however, presented: (1) whether, as Allied claims, attorneys fees are recoverable under CERCLA as response costs, and (2) whether Allied is entitled to response costs incurred prior to the DEC's Order on Consent.

Courts that have considered the issue of whether attorneys fees are recoverable by a private entity under CERCLA have reached differing results. *Compare State of Idaho v. Hanna Mining Co.,* 882 F.2d 392, 396 (9th Cir.1989) (declining to award attorneys fees under CERCLA); *Dedham Water Co. v. Cumberland Farms Diary, Inc.,* 972 F.2d 453, 464 n. 9 (1st Cir.1992) (same); *with General Elec. Co. v. Litton Industrial Automation Sys., Inc.,* 920 F.2d 1415, 1421–22 (8th Cir.1990), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991) (allowing recovery of attorneys fees). Although the Court of Appeals for the Second Circuit has not addressed this issue, this Court is persuaded by the analysis used by the majority of district judges in this circuit that have explicitly considered this issue that leads to a conclusion that attorneys fees are not recoverable as response costs under CERCLA. *See Alloy Briquetting Corp. v. Niagara Vest, Inc.,* 802 F.Supp. 943, 945–47 (W.D.N.Y. 1992); *Leonard Partnership v. Town of Chenango,* 779 F.Supp. 223, 229–30 (N.D.N.Y. 1991); *State of New York v. SCA Servs., Inc.,* 754 F.Supp. 995, 1000 (S.D.N.Y.1991). *But see Shapiro v. Alexanderson,* 741 F.Supp. 472, 480 (S.D.N.Y.1990).

In analyzing whether CERCLA allows a party to recover attorneys fees, these judges start with the "American rule" that a prevailing litigant cannot recover attorney fees from

the losing party. *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975). "[A]bsent explicit congressional authorization, attorneys' fees are not a recoverable cost of litigation." *Runyon v. McCrary,* 427 U.S. 160, 185, 96 S.Ct. 2586, 2601, 49 L.Ed.2d 415 (1976). Analysis of this issue, thus, requires examination of the statutory provisions of CERCLA.

Section 9607(a)(4)(B) enables a private party to recover from another responsible party the "necessary costs of response" to a release or threatened release of hazardous substances. 42 U.S.C. § 9607(a)(4)(B). "Response" is defined in section 9601(25) as "remove, removal, remedy, and remedial action, all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. § 9601(25); *see Alloy Briquetting,* 802 F.Supp. at 945. Hence, the question is commonly framed as follows: "whether attorney fees are recoverable as 'necessary costs' of 'enforcement activities' related to the removal of hazardous substances." *Alloy Briquetting,* 802 F.Supp. at 945.

The phrase "enforcement activities" is not defined in CERCLA and is not self-explanatory. Thus, this term must be examined in light of the legislative history of CERCLA. *See id.* From the legislative history, it is apparent that Congress intended to enable government entities to recover legal costs associated with site remediation but did not grant the same privilege to private parties. *See generally Alloy Briquetting,* 802 F.Supp. at 946 (discussing legislative history).

The Report of the House Committee on Energy and Commerce regarding H.R. 2817 explains that the addition of this language "will confirm EPA's authority to recover costs for enforcement actions taken against responsible parties." H.R.Rep. No. 253, 99th Cong., 1st Sess., pt. 1 at 66, reprinted in 1986 U.S.CODE CONG. & ADMIN.NEWS 2835, 2848–49. Significantly, no mention is made of "enforcement action" undertaken by private parties, and the amendment appears to relate only to cost recovery actions undertaken by the government under 42 U.S.C. § 9607(a)(4)(A), which imposes liability for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe...." *Id.* Moreover, while the CERCLA statutory scheme allows one private party to recover response costs from another private responsible party, the statute does not enable a private party to sue another to force the other to cleanup the site; thus a private party cannot "enforce CERCLA's cleanup provisions against another private entity." *In re Hemingway Transport, Inc.,* 126 B.R. 656, 663 (D.Mass.1991), *aff'd,* 954 F.2d 1 (1st Cir.1992); *Leonard Partnership,* 779 F.Supp. at 229.

The absence of a more explicit statutory grant of the right to recover attorney fees leads this Court to conclude that such fees are not recoverable under CERCLA. *See Alloy Briquetting,* 802 F.Supp. at 946. "Many courts have found that CERCLA lacks the specificity required under *Alyeska* and *Runyon* holdings." *Fallowfield Development Corp. v. Strunk,* 766 F.Supp. 335, 338 (E.D.Pa.1991); *Alloy Briquetting,* 802 F.Supp. at 946. The lack of specificity is more telling since Congress has specifically provided for recovery of attorneys fees for certain parties under different sections of CERCLA. *See Alloy Briquetting,* 802 F.Supp. at 94.

Moreover, when Congress overhauled CERCLA in the Superfund Amendments and Reauthorization Act of 1986, it did not amend section 107 of the Act to provide for recovery of attorneys fees by private entities. *Leonard Partnership,* 779 F.Supp. at 229 (quoting *Regan v. Cherry Corp.,* 706 F.Supp. 145, 149 (D.R.I.1989)); *SCA Servs.,* 754 F.Supp. at 1000. The fact that Congress did not avail itself of that opportunity to correct courts that had denied recovery of attorneys fees supports the conclusion that Congress did not intend to extend this privilege to private entities. *Leonard Partnership,* 779 F.Supp. at 229; *SCA Servs.,* 754 F.Supp. at 1000.

Atochem next argues that Allied has contractually assumed its response costs incurred prior to the Order on Consent because the costs were incurred when Allied complied with a municipal agency's request

or a requirement under CEQR. This objection is without merit. As discussed above, CEQR does not require Allied to remediate the site, and Allied's participation in developing an environmental impact statement for its proposed development project was not undertaken pursuant to an order. Section 8(a)(2) of the CEQR provides:

"[T]he lead agencies may prepare or cause to be prepared a draft [environmental impact statement] for an action involving a non-agency applicant. In such event, the applicant shall provide, upon request, an environmental report to assist the lead agencies in preparing or causing to be prepared the draft [statement] and such other information as may be necessary."

Thus, in providing the DEP with information, at most, Allied was responding to an agency's request. Compliance was voluntary in the sense that Allied could have chosen instead to abandon its development plans.

Plaintiff has shown and defendant does not dispute that plaintiff has incurred response costs within the meaning of CERCLA and seeks to recover such costs, even though the extent of the recoverable costs are, as yet, undetermined. Since Allied has established all the elements of liability, it is entitled to partial summary judgment even though "there is a genuine issue as to appropriate damages." *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 667 (5th Cir.1989); *U.S. v. Mottolo*, 695 F.Supp. 615, 620 (D.N.H.1988); *see also Weyerhaeuser Corp. v. Koppers Co., Inc.*, 771 F.Supp. 1406, 1414 (D.Md.1991).

In sum, defendant's motion for summary judgment in its favor is denied in all respects. Plaintiff's motion for partial summary judgment declaring that Atochem is liable under section 9607(a) for the amount of past and future response costs incurred by plaintiff that conform to the NCP and are not contractually barred is granted. The question of the amount of damages recoverable must await a later determination.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.