**BUFFALO COLOR CORP., Plaintiff,**

v.

**ALLIEDSIGNAL, INC., Defendant.**

**No. 97–CV–478C.**

United States District Court, W.D. New York.

March 26, 2001.

Buchanan Ingersoll, P.C. (Martha M. Harris, of Counsel), Buffalo, New York, for Plaintiff.

Phillips, Lytle, Hitchcock, Blaine & Huber, LLP (Kevin M. Hogan, of Counsel), Buffalo, New York, for Defendant.

## INTRODUCTION

CURTIN, District Judge.

Plaintiff Buffalo Color Corporation ("Buffalo Color") brings this action pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a), 9613(f)(1), 9613(g)(2), the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and the laws of New York State. Plaintiff seeks to recover from defendant AlliedSignal Inc. ("AlliedSignal") the necessary costs it has incurred and will incur in connection with the investigation and remediation of the hazardous wastes found at the Buffalo Dye Plant.

Currently before the court is Buffalo Color's motion for partial summary judg-ment on its second and third causes of action [1], and on AlliedSignal's first through eleventh and thirteenth through nineteenth affirmative defenses (Items 11—17, 22, 25, 28—30). AlliedSignal cross-moves for summary judgment (Items 19—21, 23, 24, 26, 27, 31, 33). The parties also filed a Joint Appendix (Item 18).

## BACKGROUND

### I. Facts

Buffalo Color is the current owner and operator of the chemical manufacturing plant ("Dye Plant") located at 100 Lee Street in Buffalo, New York. The Dye Plant is situated on approximately 42 acres of property previously divided into five geographic regions known as Areas A, B, C, D, and E. Only Areas A, B, C, and E of the Dye Plant are the subject of this litigation.

Operations at the Dye Plant date back to 1879 and were limited to the area of the plant now known as Area A, which fronts on the Buffalo River. From 1879 to 1899, the Dye Plant was operated as a coal tar dye manufacturing facility by Schoellkopf Aniline and Chemical Company of Buffalo, owned by two brothers, Jacob F. Schoellkopf, Jr. and C.P. Hugo Schoellkopf. On or about December 18, 1899, the Schoellkopf, Hartford and Hanna company was incorporated, whereupon it consolidated with three other companies to form one large company. In 1915, Schoellkopf, Hartford and Hanna changed its name to Schoellkopf Aniline and Chemical Works, Inc.

---

**1.** Buffalo Color did not seek summary judgment on its First Cause of Action, liability under CERCLA § 107, because subsequent to bringing its suit against AlliedSignal, the Second Circuit held that a private party may not bring a cost and recovery action against another potentially responsible party under this provision. Consequently, Buffalo Color did not challenge AlliedSignal's motion for summary judgment on this cause of action. Buffalo Color is limited to asserting a contribution action under CERCLA § 113 for reimbursement. *Prisco v. A & D Carting Corp.,* 168 F.3d 593, 603 (2d Cir.1999). See *infra* Section II(C), p. 33.

In 1917, Schoellkopf Aniline and Chemical Works, Inc., and five other companies contracted to form a new company, National Aniline and Chemical Company ("National Aniline"), to manufacture various coaltar products. A short time later, Schoellkopf Aniline and Chemical Works, Inc., was dissolved. In 1920, Allied Chemical and Dye Corporation began to acquire capital stock in National Aniline. In 1941, Allied Chemical liquidated National Aniline (by then its wholly owned subsidiary) and began operating National Aniline as a division of the corporation. In 1958, Allied Chemical and Dye changed its name to Allied Chemical Corporation. After acquiring the Signal companies in 1985, Allied Corporation adopted its current name, AlliedSignal, Inc. ("AlliedSignal").

By Purchase Agreement dated June 16, 1977, Buffalo Color purchased Areas A, B, C, and E of the Dye Plant from AlliedSignal. Manufacturing activities in Area D had ceased prior to the sale and were not restarted by Buffalo Color. According to the Purchase Agreement, Buffalo Color purchased the real property and equipment comprising the Dye Plant, as well as the right to manufacture and sell certain products and intermediates. Section 3 of the Purchase Agreement, entitled "Assumption of Certain Liabilities by Purchaser," addressed the liability that each party would assume following the sale. Buffalo Color and AlliedSignal now point to this section of the Agreement as indicating that the other party has liability for cleanup of hazardous materials discovered on plant property.

## A. *Discovery of Hazardous Waste* [2]

Sometime before 1977, three impoundments were built on land located in Area E. In 1980, Buffalo Color submitted an application to operate the impoundments, as required by the Resource Conservation and Recovery Act (RCRA), thus bringing the Dye Plant within RCRA's regulatory jurisdiction.[3] In 1986, the Department of Environmental Conservation ("DEC"), which has the authority to administer RCRA in New York State, closed two of the impoundments and ordered the third closed in 1989.

Closure of the impoundments involved dewatering, excavation of contaminated sludges, and backfilling with clean soil. Contaminated soils beneath the impoundments remained after closure. At the time the impoundments were closed, hazardous substances were detected in the groundwater in monitoring wells in Area E.

During this same time period (from 1986 to 1991), the DEC and U.S. Environmental Protection Agency (EPA) conducted a RCRA Facility Assessment ("RFA") of the Dye Plant to determine whether any hazardous waste or its constituents had been released from those areas of the facility where the solid waste activities had been conducted. By letter dated September 10, 1991, Buffalo Color tendered a demand to AlliedSignal for reimbursement of past and future costs regarding investigation and remediation of areas A, B, C, and E. Item 24, Exh. 42. In 1992, the DEC was delegated the authority to administer the Hazardous and Solid Waste Amendment ("HSWA") to RCRA. The HSWA required

**2.** Subsequent to the sale, Area D was placed on the New York State Department of Environmental Conservation ("DEC") Registry of Inactive Hazardous Waste Sites. Pursuant to a DEC consent order, AlliedSignal is responsible for the remediation of that property, and that remediation is not an issue in the present litigation.

**3.** RCRA, 42 U.S.C. §§ 6901 *et seq.* (1995), governs the treatment, storage and disposal of solid and hazardous waste. *Nashua Corp. v. Norton Co.,* 116 F.Supp.2d 330, 355 (N.D.N.Y. 2000).

any permit issued under RCRA after November 1984 to address corrective action for releases from solid waste management units at a facility. Item 12, p. 3.

In 1995, the DEC announced the results of the RFA study. Essentially, the agency concluded that releases of hazardous substances had occurred and may continue to occur at the Dye Plant from several areas, including the impoundments mentioned above, as well as closed and active sewer lines. Consequently, the DEC issued Buffalo Color a final post-closure permit pursuant to 6 N.Y.C.R.R., Part 373 ("Part 373 permit"). The permit required Buffalo Color to remediate releases from both the closed and active sewer lines and the contamination arising from a number of potential sources, including the impoundments. In fact, due to the density of the sewer lines and the numerous areas of chemical handling located on the property, the entire active area of the Dye Plant (including Areas A, B, C, and E) was subject to the permit's corrective action requirements.

Buffalo Color has already conducted an RCRA Facility Investigation ("RFI") to determine the nature and extent of the releases and potential releases of hazardous wastes and/or constituents from Areas A, B, C, and E. The RFI Final Report was issued in December, 1998. Item 18, Tab 5. Buffalo Color is currently preparing a Corrective Measure Study ("CMS") to determine potential approaches for remediation of the identified releases. The DEC will review the CMS and select the most appropriate remediation plan. So far, Buffalo Color asserts that it has incurred costs totaling $337,870 in performing the RFI and formulating the CMS. Initial estimates regarding the alternative corrective actions considered in the CMS range from $9.5 to $11.2 million.

AlliedSignal concedes that one or more of its admitted predecessors owned and operated the Dye Plant from December 18, 1899 to June 30, 1977, and has stipulated that it will assume any CERCLA liability attributable to the Dye Plant during that time period. Item 18, Tab 3, pp. 2–3. However, AlliedSignal steadfastly denies that any such liability exists, claiming that there was no disposal of hazardous substances during that time period or, in the alternative, that the Purchase Agreement relieved it of any such liability. Because of AlliedSignal's denial, Buffalo Color commenced this action, asserting three causes of action. The first and second causes of action seek to hold AlliedSignal liable under Sections 107(a)(2) and 113(f)(1) of CERCLA. The third cause of action sets forth a claim against AlliedSignal for indemnity under Section 3(b) of the Purchase Agreement.

On September 9, 1999, Buffalo Color filed a motion for partial summary judgment on its second and third causes of action, and also on AlliedSignal's first through eleventh and thirteenth through nineteenth affirmative defenses. Item 11. In response, AlliedSignal cross-moved for summary judgment dismissing Buffalo Color's complaint in its entirety on the ground that the Purchase Agreement relieves it from any liability. Item 19. In the alternative, AlliedSignal moved for partial summary judgment dismissing Buffalo Color's claim that AlliedSignal was jointly and severally responsible for all response costs pursuant to CERCLA § 107.

## DISCUSSION

### I. Standard for Summary Judgment

Both Buffalo Color and AlliedSignal have moved for summary judgment of the action or part of the action in their respective favors. Summary judgment is appropriate where a review of the record reveals that there is no genuine issue as to any

material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the responsibility of identifying for the court the portions of the record which demonstrate the absence of any material facts. *Federal Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Endico Potatoes, Inc., v. CIT Group Factoring,* 67 F.3d 1063, 1066 (2d Cir.1995) (quoting Fed. R.Civ.P. 56(e)). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Podell v. Citicorp Diners Club Inc.,* 112 F.3d 98, 100 (2d Cir.1997). The litigant opposing summary judgment must therefore bring forward some affirmative indication that his version of relevant events is not "fanciful." *Id.* at 100.

"Entry of summary judgment indicates that no reasonable jury could return a verdict for the losing party." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991). When deciding a motion for summary judgment, courts "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *American Casualty Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir. 1994) (quotation and citation omitted).

## II. Arguments for Summary Judgment

The present motions for summary judgment ask this court to make two determinations: first, whether, under CERCLA, AlliedSignal is a responsible party and is therefore liable for its equitable share of costs incurred by Buffalo Color for Dye Plant remediation; and second, the legal effect that Section 3 and other sections of the Purchase Agreement have on the parties' respective liabilities in this action.

### A. Summary Judgment on Plaintiff's Second Cause of Action

There are generally two issues in CERCLA cases brought by a company against another company: (1) whether the defendant company is liable for contribution of remediation costs, and (2) if liable, for what amount. Here, Buffalo Color's summary judgment motion is limited to whether AlliedSignal is a responsible party under CERCLA and, as such, is therefore liable for a portion of the costs Buffalo Color has and will incur in performing the hazardous waste clean-up at the Dye Plant. *See* 42 U.S.C. §§ 9607(a)(2), 9613(f).

### 1. Is AlliedSignal Liable for a Portion of the Costs of The Dye Plant Clean–Up?

The elements of an action under Section 113(f)(1)[4] of CERCLA are the same as those under Section 107(a).[5] *See* CERCLA § 113(f)(1) ("Any person may seek contribution from any other person who is liable or potentially liable under [CERCLA § 107(a) ].") Hence, to establish a prima facie cause of action for contribution, a private party must show:

(1) Defendant fits within one of the four classes of responsible parties outlined in § 107(a).

(2) The site is a facility.

---

**4.** Codified at 42 U.S.C. § 9613(f)(1).

**5.** Codified at 42 U.S.C. § 9607(a).

(3) There is a release or threatened release of hazardous substances at the facility.

(4) The plaintiff incurred costs responding to the release or threatened release.

(5) The costs and response actions conform to the National Oil and Hazardous Substances Pollution Contingency Plan.[6]

*Bedford Affiliates v. Sills,* 156 F.3d 416, 427 (2d Cir.1998).

It is not disputed that the Dye Plant is a facility within the meaning of CERCLA. Item 18, Tab 2, ¶ 19. As such, the court's analysis is limited to whether: (1) AlliedSignal is a responsible party; (2) there was a release or threatened release of hazardous substances at the facility; (3) Buffalo Color incurred costs responding to the release or threatened release; and (4) those costs and response actions conform to the National Contingency Plan ("NCP").

### a. Were Hazardous Wastes Released at the Dye Plant between 1899 and 1977?

AlliedSignal concedes that it would be a responsible party under Section 107(a)(2) of CERCLA if hazardous waste had been released at any time between 1899 and 1977; however, defendant disputes that such a release occurred during that time period. Item 18, Tab 2, ¶¶ 21, 22. Specifically, AlliedSignal argues that plaintiff fails to prove that the releases which caused the contamination at the Dye Plant occurred from 1899 to 1977, or in the alternative did *not* occur prior to 1899. These arguments, however, fail.

■ Both the statute and the case law on this issue clearly indicate that it is the disposal of hazardous substances during a party's ownership or operation, rather than the release, that subjects a party to liability. *See* 42 U.S.C. § 9607(a)(2); *see also Allied Princess Bay Co. v. Atochem North America,* 855 F.Supp. 595, 604 (E.D.N.Y.1993) (citing *Westwood Pharm. v. National Fuel Gas Dist. Corp.,* 737 F.Supp. 1272, 1277–79 (W.D.N.Y.1990)). Moreover, the fact that plaintiff failed to provide evidence that hazardous materials were *not* dumped on the land prior to 1899 does not undermine its motion for summary judgment. For liability to be assigned, the law merely requires plaintiff to demonstrate that such materials were disposed of on the property during defendant's ownership. *City of New York v. Chemical Waste Disposal Corp.,* 836 F.Supp. 968, 979 (E.D.N.Y.1993).

■ To establish that hazardous substances were disposed at the Dye Plant between 1899 and 1977, plaintiff primarily relies on the report issued by the DEC at the conclusion of the RFA (the "RFA Report"), as well as the sworn statement of former AlliedSignal employee David E. Sauer ("Sauer"). Item 15. Sauer began working for AlliedSignal in the early 1970s and relates his firsthand account of the routine spillage and leakage of hazardous substances that resulted from the manual or semi-manual transfer of raw materials and intermediaries during the various manufacturing processes. Item 15, ¶¶ 5–7. Sauer also confirmed that during the same time period, wastewater containing raw materials and unwanted products, many of which are considered hazardous under CERCLA, were discharged into the facility's sewer system to the on-site treatment plant or the impoundments located in Area E. *Id.* ¶¶ 7, 12. Attached to Sauer's Affidavit as Exhibit A is a "History of Incidents and Violations" at the Dye Plant which contains tables describing various

---

**6.** Codified at 42 U.S.C. § 9605, the NCP is a regulation promulgated by the EPA to establish procedures for investigating and selecting a remedy for contaminated sites.

incidents from 1965—1997, wherein hazardous materials were released.

The RFI Report supports Sauer's account. Item 18, Tab 5. The Report confirms that many of the substances contained in the wastewater discharge by AlliedSignal's predecessors, while not detected in the up-gradient groundwater wells, have been detected in the groundwater along their down-gradient edge. *Id.* p. 10. This finding establishes that contaminants that had been placed in the lined or unlined impoundments have entered the environment. *Id.* pp. 8, 12, 13. *See also* Senefelder Aff., Item 13, ¶¶ 4—7.

Furthermore, Buffalo Color has submitted evidence that during the 1899—1977 time period, hazardous chemicals were spilled both inside the plant as well as discharged into the Buffalo River and through the facility's sewer system to the on-site treatment plant. Item 14, Ex. F; Item 15, ¶ 7; Item 16. *See* list of hazardous substance disposal, Item 32, pp. 7–8. AlliedSignal attempts to argue that such spillage is not considered a release under CERCLA, but the law on the issue states the opposite. *See* 42 U.S.C. § 6903(3) (disposal includes "the discharge ... spilling, leaking ... of any [hazardous substance] into or on any land or water ... so that [the substances] may enter the environment or be emitted into the air or discharged into any waters, including ground waters.")

█ In another attempt to thwart Buffalo Color's motion for summary judgment on liability under CERCLA, AlliedSignal argues that even if it can be established that hazardous materials were disposed of on plant property sometime between 1899 to 1977, Buffalo Color fails to link those disposals with the clean-up costs it has incurred and will continue to incur in the future. However, the Second Circuit in *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 603 (2d Cir.1999), held that a defendant cannot escape liability by showing that the hazardous substances attributable to it are not linked to plaintiff's response costs.

In addition, AlliedSignal has not come forth with any 30(b)(6) witnesses able to testify to the factual basis for AlliedSignal's contention that hazardous substances were not disposed of at area ABCE at any time from December 18, 1899 through June 30, 1977. Item 14, Ex. D, ¶¶ 7, 8.

Accordingly, Buffalo Color has demonstrated that hazardous materials were disposed of on Dye Plant property during the 1899 to 1997 time period and, as such, AlliedSignal is a responsible party under Section 107(a)(2) of CERCLA and could be held liable for the clean-up costs under Section 113(f) of that statute if Buffalo Color can establish that it has incurred clean-up costs consistent with the NCP.

**b. Are the Costs Plaintiff Incurred in the Clean–Up of the Dye Plant Consistent with The NCP?**

█ AlliedSignal also contends that summary judgment must be denied because it is premature to determine whether plaintiff has incurred costs for the clean-up and whether those costs are consistent with the NCP. More specifically, AlliedSignal argues that because this court bifurcated this litigation, ordering that initial discovery and motion practice be limited to liability issues, it has not had an opportunity to investigate any of plaintiff's assertions as to the costs it has incurred thus far and whether those costs comply with the NCP.

The court agrees. There are problems with granting summary judgment on this issue at this point in the litigation. Under the bifurcation order, there has been no discovery by the parties as to costs of the

initial investigation and the amount which should be awarded. In addition, numerous courts have pointed out that "consistency with the NCP is a peculiarly fact intensive question that can normally only be determined at trial, or at least after a full pretrial record has been prepared." *Carlyle Piermont Corp. v. Federal Paper Board Co., Inc.*, 742 F.Supp. 814, 819 (S.D.N.Y.1990) (citing cases).

As such, without discovery and a fully developed factual record, any determination regarding Buffalo Color's costs to date is premature; and for that reason, Buffalo Color's summary judgment motion on its CERCLA cause of action is denied, with leave to renew after further proceedings. On these issues, further discovery and a hearing may be necessary.

### B. *Plaintiff's Summary Judgment Motion on its Third Cause of Action and Cross–Motion for Summary Judgment: The Contract Claim*

#### 1. Assertions by the Parties

Both Buffalo Color and AlliedSignal argue that Section 3 of the Purchase Agreement supports their respective motions for summary judgment. Buffalo Color contends that Section 3(b) of the agreement indemnifies it from any liability for CERCLA costs attributable to operations at the plant prior to the closing date. Further, Buffalo Color argues that its purchase of the Dye Plant "was not intended to carry with it a broad assumption ... of all the liabilities associated with [the plant's] nearly one hundred year operational history." Item 12, p. 15. Rather, Buffalo Color was only to assume those liabilities set forth in Section 3(a) of the Agreement, and "*all* other liabilities ... [would] be retained by the seller." *Id.*

Section 3(b) of the Purchase Agreement provides:

*Except as expressly provided* in this Agreement, Purchaser shall not assume any other liability or obligation of Seller, fixed or contingent, disclosed or undisclosed, at the Closing Date nor be required to defend any suit or claim arising out of any act, event or transaction occurring prior to the Closing Date or out of any condition existing prior to the Closing Date, in connection with the ownership or operation of the Buffalo Color Business, and *Seller shall indemnify and hold Purchaser harmless from and against any and all costs, expenses, losses or liabilities,* including attorneys fees, *suffered or incurred by Purchaser arising out of any such liability or obligation not expressly required to be assumed by Purchaser* as provided in this Agreement.

Item 18, Tab 4, pp. 17–18 (emphasis added).

For its part, AlliedSignal disputes Buffalo Color's interpretation of the contract, and asserts that any liability which may be attributable to operations conducted at the Dye Plant by AlliedSignal's predecessors was assumed by Buffalo Color pursuant to Section 3(a)(2)(ii) of the Agreement. AlliedSignal contends that this section is "sufficiently general to include any and all environmental liabilities, including the costs of remediating contamination on the property that preexisted the closing date." Item 20, p. 38. In support of its interpretation of the agreement, AlliedSignal claims that (1) it made no representation or warranty about the condition of the property; (2) Buffalo Color was provided full access to the property and accepted the condition of the property "as is;" and (3) both parties acknowledged that due to the age of the plant and the nature of the chemical manufacturing operations, on-site contamination was possible.

Section 3(a)(2)(ii) of the contract provides:

Effective the Closing Date, *Purchaser* shall assume and agree to pay, perform and discharge, and to *indemnify Seller* against and hold it harmless from any costs, expenses, losses or liabilities, including attorneys fees, suffered or incurred by Seller for reason of ... (2) all obligations and liabilities relating to the Buffalo Color Business arising out of *claims made, or suits brought by employees or third parties* for injury, sickness, disease or death of any person, or *any damage to any property,* on or after the Closing Date, in either case which resulted from ... (ii) *fault or defect, patent or latent, in the physical assets* described in Sections 2(b)(1) and 2(b)(2) above, whether or not such fault or defect existed prior to the closing date.

Item 18, Tab 4, pp. 14–15 (emphasis added).

In response to AlliedSignal's argument, Buffalo Color maintains that Section 3(a)(2)(ii) pertains only to claims raised by, and potential liability to, Dye Plant employees or other third parties, and does not require Buffalo Color to indemnify AlliedSignal for environmental liabilities. Further, Buffalo Color argues that if a contract does not expressly provide for assumption of liability and indemnification for CERCLA claims (which this contract does not), in order for the Purchaser to assume CERCLA liability, the language must be broad enough so as to reflect the parties' intent to include *all* liabilities of any type whatsoever. Because the language in Section 3(a)(2)(ii) is *not* broad, and does not allocate those liabilities, Buffalo Color argues that the Agreement did not absolve AlliedSignal of its liability for CERCLA violations.

### 2. General Legal Principles

#### a. CERCLA

■■ The Second Circuit has joined other Circuits in interpreting Section 107(e)(1) of CERCLA to allow private parties to contract with each other concerning indemnification and contribution, with the caveat that, notwithstanding the terms of such contracts, all responsible parties remain fully liable to the government. *Olin Corp. v. Consol. Aluminum Corp.,* 5 F.3d 10, 14 (2d Cir.1993). In other words, "responsible parties can lawfully allocate CERCLA response costs among themselves while remaining jointly and severally liable to the government for cleanup." *SmithKline Beecham Corp. v. Rohm & Haas Co.,* 89 F.3d 154, 158 (3d Cir.1996). In this case, the parties could not have expressly included CERCLA liabilities in the 1977 purchase agreement since it predated the enactment of CERCLA in 1980. Many courts have found that an agreement can require one party to indemnify another against CERCLA response costs, even if it was executed before the advent of CERCLA. A pre-CERCLA indemnification provision covers response costs if it is either "specific enough to include CERCLA liability or general enough to include any and all environmental liability." *Id. See Olin Corp.,* 5 F.3d 10 (2d Cir.1993). However, if the agreement appears to be limited to specific disputes or particular types of liability, CERCLA liability will be excluded unless the agreement contains a clear, unambiguous reference to such liability. *See, e.g., Mobay Corp. v. Allied–Signal, Inc.,* 761 F.Supp. 345, 357–58 (D.N.J.1991). State law would then apply when interpreting the contractual provisions, which must evidence a "clear and unmistakable intent" that one party indemnify the other for all liabilities related to the purchase of the site, even future unknown liabilities. *Olin Corp.,* 5 F.3d at 15, 16.

#### b. Contract Law

■■ Under New York law, the terms of a contract must be construed so as to

give effect to the intent of the parties as indicated by the language of the contract. *Curry Road Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir.1990) (citing cases). The plain and ordinary meaning of the terms govern. *Wood v. Maggie's Tavern, Inc.*, 257 A.D.2d 733, 683 N.Y.S.2d 353 (3d Dept.1999).

When a claim is made that a duty to indemnify is imposed by an agreement, the agreement must be strictly construed so as not to read into it any obligations the parties never intended to assume. "Contracts indemnifying a party against his own negligence are generally disfavored ... and are subject to close judicial scrutiny." *Purolator Products Corp. v. Allied–Signal, Inc.*, 772 F.Supp. 124, 130–31 (W.D.N.Y.1991) (citations and quotations omitted). For that reason, a court will not find a duty to indemnify absent manifestation of a clear and unmistakable intent to indemnify. *Manley v. AmBase Corp.*, 121 F.Supp.2d 758, 768–69 (S.D.N.Y.2000) (citations omitted). In addition, "whether a contract is ambiguous is a question of law," and "only when the language of the contract is ambiguous may a court turn to extrinsic evidence of the contracting parties' intent." *Id.*

Further, " 'language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in litigation.' " *Union Carbide v. Thiokol Corp.*, 890 F.Supp. 1035, 1048 (S.D.Ga.1994) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (interpreting New York law)).

### 3. The Purchase Agreement

#### a. Section 3a

The issue to be resolved in this cause of action is the scope of indemnification under Section 3 of the Purchase Agreement. Buffalo Color interprets Sections 3a and 3b as clearly standing for the proposition that liability for clean-up remains with AlliedSignal. AlliedSignal just as vociferously argues that the provisions clearly transfer liability to Buffalo Color.

The parties do not dispute the fact that the purchase agreement does not expressly refer to CERCLA claims. Therefore, in order for Section 3a to allocate liability to Buffalo Color, the court must find that the wording of this pre-CERCLA agreement is either specific enough to include CERCLA liability or general enough to include any and all environmental liability. Otherwise, Section 3b will govern, which provides that AlliedSignal will indemnify Buffalo Color for CERCLA liability. And given the rules of contract construction, it is necessary to determine whether the wording, and thus the intent of the parties, is clear, or whether it is ambiguous, which would require extrinsic evidence to clarify the parties' intent.

Section 3a does not, by its terms, provide for an all-encompassing assumption of liability on the part of Buffalo Color. Rather, the contract *limits* Buffalo Color's indemnification of AlliedSignal to two major subsets of activities: the first generally concerns claims/obligations arising from leases, licenses, permits, other binding arrangements, and capital commitments [Sec. 3(a)(1)], and the second concerns claims made by employees or third parties resulting from (i) substances discharged on/after the closing date; (ii) fault or defect, patent or latent, in the physical assets; (iii) exposure of certain employees to products described in an exhibit attached to the contract [Sec. 3(a)(2)].

These specific enumerations of indemnity-liability contrast starkly with contractual provisions where courts have found that the language is broad enough to encom-

pass CERCLA liability, which reflect the parties' clear intent to allocate all present and future liabilities, including environmental liabilities. Coverage has been found in contracts where the purchaser "assume[s] and agree[s] to be responsible for and to pay, perform, discharge and indemnify Olin against, *all liabilities, obligations and indebtedness of Olin* related to the Aluminum Assets . . . ." (*Olin Corp.*, 5 F.3d at 12); purchaser "indemnif[ies] and hold[s] harmless [seller] from and against *any and all damages, losses and expenses* . . ." in conjunction with a Release Agreement where the buyer unconditionally releases seller from "*any claims, liabilities, actions and causes of action* [buyer] may have under the Purchase Agreement," (*Keywell Corp. v. Weinstein,* 33 F.3d 159, 162 (2d Cir.1994) (emphasis added)); purchaser indemnifies seller against "*[a]ll material liabilities relating to the conduct of the Business* prior to the First Closing Date [and] . . . *all losses and liabilities* resulting from the operation of the Business by the Buyer after the First Closing Date." (*SmithKline Beecham Corp.*, 89 F.3d at 157 ) (emphasis added).

The language used in the instant Purchase Agreement does not contain such broad language and reveals that the parties did *not* intend for Buffalo Color to assume environmental liabilities.

### 1. Application

Nevertheless, AlliedSignal raises a number of points in an attempt to prove that Section 3(a)(2)(ii) unequivocally allocates environmental cleanup responsibility to Buffalo Color: (1) it characterizes the provision as a release, as opposed to an indemnity, which shifts the burden to Buffalo Color to establish that the general release is limited; (2) it reads the terms "all obligations and liabilities," "any damage to any property," and "fault or defect, patent or latent, in the physical assets" extremely broadly, so as to encompass environ-

mental contamination; (3) it argues that the instant suit arises from a third-party claim, resulting in Buffalo Color's assumption of liability; (4) and lastly, AlliedSignal points to other sections within the four corners of the Purchase Agreement as fortifying its contention that the parties' intent was "unmistakably" clear that Buffalo Color assumed all liabilities. The court will address each argument seriatum.

■■■ (1) Citing *Hatco Corp. v. W.R. Grace & Co.,* 59 F.3d 400 (3d Cir.1995), AlliedSignal characterizes Section 3(a)(2)(ii), in a footnote, as a release, the significance of which serves to "shield the beneficiary of th[e] agreement from liability rather than to shift its responsibility to another as is the case of a contract to indemnify." *Id.* at 405.

This court finds that the provision at issue is clearly an indemnity agreement, given that the plain language used in 3(a) asserts that Buffalo Color will "*indemnify* Seller against and hold it harmless from any costs, expenses, losses or liabilities . . . ." Buffalo Color did not renounce any claim, but agreed via Section 3(a) to assume liabilities that otherwise would have been AlliedSignal's. As an indemnification provision, the section must be interpreted strictly. The next section, *infra,* makes it clear that Buffalo Color would indemnify AlliedSignal only for certain specified obligations.

(2) AlliedSignal next parses the language of Section 3(a)(2)(ii) in an attempt to broaden its coverage. However, in the process of examining the meaning and breadth of certain phrases, AlliedSignal removes phrases from context and distorts their plain meaning. According to the provision, Buffalo Color agreed to indemnify AlliedSignal not for "all obligations and liabilities," but for "all obligations and liabilities relating to the [Buffalo Color]

business *arising out of claims made, or suits brought by employees or third parties for injury, sickness, disease or death ...*" (the "introductory phrase"). "All obligations and liabilities" modifies the phrase referring to claims made/suits brought by employees or third parties—tort-type claims—and does not reflect any intent to include environmental liabilities.[7] AlliedSignal's effort to read the clause differently by asserting, for example, that the placement of the comma after "claims made" indicates that only personal injury suits brought by third parties are subject to the employee/third party limitation, is unreasonable. *See Matter of W.T. Grant Co.*, 4 B.R. 53, 71 (Bankr.S.D.N.Y.1980) (reliance on punctuation to discern parties' intent is disfavored in New York and should only be used as last resort). Further, as Buffalo Color points out, excision of the phrase "by employees or third parties" would rob the provision of meaning. In interpreting the introductory phrase, the court finds that the assertion of a claim or suit against AlliedSignal by an employee or another third party is a necessary prerequisite to Buffalo Color's indemnity obligation under Section 3(a)(2).

■ And given the rule articulated above that indemnity clauses must be interpreted strictly, the broad construction of the phrase "any damage to any property ... which resulted from ... fault or defect, patent or latent, in the physical assets" that AlliedSignal seeks to impose on Buffalo Color so as to encompass environmental liabilities also fails[8]. The court agrees with Buffalo Color that the plain meaning of "fault or defect"[9] relates to inherent problems in the physical assets, and would not expand to encompass subsurface soil and groundwater contamination caused by release of hazardous chemicals. Defects, for example, usually occur in New York case law in the context of product defects, where a product "is not properly made" or "is not reasonably safe when used for its intended or for an unintended but reasonably foreseeable purpose." *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 264, 265, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995) (Dissenting Opinion) (quotation omitted).

Even assuming *arguendo* that it may be possible to consider the phrase "any damage to any property" as somehow *not* related to employee torts, and thus encom-

**7.** Buffalo Color also points out that the only place in Section 3 which might possibly cover environmental liability is Section 3(a)(2)(i) where Buffalo Color agrees to indemnify AlliedSignal for "any substance discharged." However, such liability would only arise "on or after the Closing Date," yet another indication that the parties did not intend for Buffalo Color to assume all environmental liabilities.

**8.** One of the difficulties in interpreting contract provisions from different cases is that very few provisions contain similar wording. However, in *Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345 (D.N.J.1991), the contract stated that the buyer would indemnify AlliedSignal from " 'all obligations and liabilities ... arising out of claims made, or suits brought, on or after the Closing Date for (i) injury, sickness, disease or death of any person, or (ii) any damages to any property, in

either case which is ultimately determined ... to have resulted from any condition existing, substance consumed or discharged ... on or after the Closing Date ....' " *Id.* at 355. AlliedSignal maintained that the property damage claims transferred CERCLA liability to the buyer. The buyer contended that the clause related to traditional property damage claims by third parties and did not extend to statutory environmental claims. The court found that the contractual phrase did not transfer CERCLA liability to the buyer.

**9.** Fault is defined as a "defect or imperfection," and defect is defined as a "shortcoming, fault or imperfection." *Random House Unabridged Dictionary*, 2d Ed.1993. Fault and defect connote structural problems. The meanings of fault or defect cannot be reasonably stretched to encompass contamination of soil and groundwater.

passing the damage wrought by hazardous chemicals to the property, still, in order for Buffalo Color to assume liability, the *cause* of such damage must result from fault or defect, patent or latent, in the physical assets, which greatly narrows the "broad" construction AlliedSignal seeks to impose. The "damage" of "environmental contamination" did not *result from* a fault or defect in the physical assets, but *caused* the problems related to the land. And given that the burden is on AlliedSignal to show that the contract evidenced a clear and unmistakable intent to indemnify, AlliedSignal's tenuous interpretation does not clear that hurdle.

Section 3(a)(2) obligates Buffalo Color to indemnify AlliedSignal in connection with personal injury or property damage claims asserted against it by third parties if such claims arise from the circumstances specified in subsections (i) to (iii). No third party has asserted such a claim; and therefore, Section 3(a)(2) is inapplicable to the present litigation.

(3) AlliedSignal's creative effort to convince the court that Section 3(a)(2) imposes upon Buffalo Color the liability for environmental remediation at the plant site can also be found in its argument that the action is "an indirect action for contribution arising out of a direct proceeding by the federal government under Buffalo Color's Part 373 permit.... Thus, although the claim for contribution ... is asserted by Buffalo Color, it is a suit arising out of a claim made by a third party (the government)." Item 20, p. 40. AlliedSignal cites bankruptcy cases, *i.e., Syntex Corp. v. Charter Co.,* 862 F.2d 1500 (11th Cir.1989), in support of that proposition. However, no third party has brought suit against AlliedSignal where Buffalo Color would be required to indemnify it, and there is no "direct proceeding by the federal government under Buffalo Color's Part 373 permit." Item 20, p. 40. AlliedSignal does

not say against whom (Buffalo Color or AlliedSignal) this direct proceeding has been brought. In any case, the impetus behind Buffalo Color bringing a direct suit against AlliedSignal was New York State DEC's issuance of the Part 373 permit. The bankruptcy cases cited by AlliedSignal stand for the proposition that because claims brought pursuant to CERCLA § 113 by parties with whom the bankruptcy debtor allegedly shared joint and several liability are contingent, they are not exempt from disallowance under the bankruptcy code. These cases do not advance AlliedSignal's contention that DEC's issuance of a permit to Buffalo Color constitutes a "claim" under Section 3(a)(2) of the Purchase Agreement.

▮ (4) AlliedSignal's last argument that Section 3(a)(2) revealed the parties clear intent that Buffalo Color would assume all liabilities relating to 'defects' in the plant, including remediation costs, is based on the rule of contract construction which provides that such intent may be discerned from the four corners of the contract. AlliedSignal points to Sections 5(h)(2) and 11(*l*) as supporting its interpretation of Section 3(a)(2)(ii).

AlliedSignal invokes Section 5 of the Purchase Agreement, entitled "Representations and Warranties of Seller" to underscore the fact that it made no representations to Buffalo Color regarding the physical condition of the plant or property, and that Purchaser would receive the property "as is."

Sections 5(h)(i) and 5(h)(ii) provide (in part):

[5(h)(i) ]: With respect to Occupational Safety and Health Act ("OSHA") matters.... Except as expressly set forth in the preceeding sentences, Seller makes no representations or warranties with respect to OSHA matters at the Buffalo Plant, including without limita-

tion, any representation or warranty as to such OSHA concerns as may arise out of the physical condition of the Buffalo Plant and its facilities, such physical condition being accepted by Purchaser, in accordance with Section 11($l$) "as is."

. . .

[5(h)(ii) ]: With respect to air and water pollution matters and solid waste disposal matters, except as may arise out of matters described in Exhibits D or G hereto, to the best of the knowledge of Seller's Corporate and Specialty Chemicals Division's officers ... the Buffalo Plant is not in material violation of any applicable Federal, state and local laws and regulations pertaining to air and water pollution or solid waste disposal, but Seller makes no representation or warranty as to whether or not the Buffalo Plant would be in compliance with laws or regulations not yet effective or to become effective on or prior to the closing date.

Item 18, Tab 4, pp. 30–31.

Section 11, entitled "Conditions Precedent to Obligations of Purchaser," acknowledged in subsection ($l$) that Buffalo Color had the opportunity to inspect the plant and had satisfied itself that the assets were in acceptable condition. It again asserted that AlliedSignal made no representation regarding the physical condition of the assets, and that Buffalo Color accepted them "as is." AlliedSignal adds that various exhibits to the Purchase Agreement provided "extensive written environmental disclosures." Item 20, p. 41. AlliedSignal seeks to show that these contractual provisions and addenda, reflecting the knowledge of the parties concerning environmental issues and less-than-state-of-the-art equipment, support its contention that the contract was intended to cover and allocate environmental liability, thus absolving AlliedSignal from liability for remediating "historic contamination at the plant." *Id.* p. 43.

Buffalo Color responds that the "as is" provision in a contract "precludes causes of action based on breach of warranty, not those based on statutory liability," including CERCLA (Item 30, p. 11), citing *Umbra U.S.A., Inc. v. Niagara Frontier Trans. Auth.*, 262 A.D.2d 980, 693 N.Y.S.2d 371, 372 (4th Dept.1999). *See also International Clinical Laboratories, Inc. v. Stevens*, 710 F.Supp. 466 (E.D.N.Y. 1989); and *Haynes v. Kleinewefers & Lembo Corp.*, 921 F.2d 453, 458 (2d Cir. 1990) (citing *Alger v. Abele Tractor & Equip. Co.*, 92 A.D.2d 677, 460 N.Y.S.2d 202 (3d Dept.1983)) (finding 'as is' disclaimer was irrelevant to the question of whether a party is obligated to indemnify). Courts have agreed that "purchases of a business 'as is' do not absolve a seller from CERCLA liability." *Mobay*, 761 F.Supp. at 355–56.

Sections 5(h)(i) and 11($l$) of the Purchase Agreement do not advance AlliedSignal's interpretation of the contract. These provisions do not imply that Buffalo Color accepted liability for hazardous chemical remediation as a consequence of accepting the property "as is".

In addition, while the language of 5(h)(ii) indicates that Buffalo Color may have had pre-closing notice of possible environmental problems at the plant site, it also sets forth that the plant was not in violation of federal, state, or local environmental laws. The significance of 5(h)(ii) concerns the limits of a breach of warranty claim Buffalo Color might assert regarding future laws or regulations. The disconnect between a simple mention of potential future environmental laws with AlliedSignal's assertion that such mention encompasses express assumption of liability for present and past violations is apparent and does not aid AlliedSignal in its quest to foist liability on Buffalo Color. The final word on this matter reveals that the issue here

is quite simple. "If the parties intended such an indemnity, they could have drafted appropriate specific language to reflect this intent, or—quite simply—they could have drafted all-encompassing broad language ...." *55 Motor Ave. Co. v. Liberty Indus. Finishing Corp.,* 1994 WL 241104 at *5 (E.D.N.Y.1994).

### b. Section 3b

Buffalo Color argues that Section 3 of the Purchase Agreement reflects the parties' intent that Buffalo Color assume only the liabilities "expressly" set forth in Section 3a or in other provisions of the contract. If no such liability was expressly assumed, then all other liabilities would be retained by AlliedSignal, as set forth in Section 3b. Therefore, Section 3b clearly requires AlliedSignal to indemnify Buffalo Color regarding any CERCLA liability arising from the pre-closing operations at the plant.

Maintaining that the broad language of Section 3(a)(2)(ii) applies to the allocation of liability, AlliedSignal regards Section 3b, consequently, as totally inapplicable. It further argues that reading 3(a)(2)(ii) to "carve out" CERCLA liabilities would contravene the broad language of that provision, rendering it meaningless. However, since the court found that Section 3(a)(2)(ii) did not require Buffalo Color to indemnify AlliedSignal for environmental remediation, it finds that Section 3b governs CERCLA liability between the parties. Since environmental remediation was *not expressly* covered in 3(a)(2)(ii), Section 3b requires AlliedSignal to indemnify Buffalo Color regarding CERCLA liability.

### c. Section 16

██ Although the court has spent considerable time reviewing Section 3's contractual provisions, the court finds, in the end, that Section 16 controls the contractual indemnity claims. Nevertheless, the court felt compelled to take up the Section 3 issues at length because they were important to the summary judgment argument on the third cause of action.

Section 16 of the Purchase Agreement, the "survival" provision, reads:

All representations, warranties and agreements made by Purchaser and Seller in this Agreement ... shall survive the closing of title... provided, however, that ... (b) no claim with respect to any ... representations, warranties and agreements [other than those relating to the state of the Seller's title] shall be asserted after the second anniversary of the Closing Date.

Item 18, Tab 4, pp. 75–76.

As a seventeenth affirmative defense, AlliedSignal asserts that by virtue of Section 16, the time period in which Buffalo Color could bring the claims asserted in the complaint expired on June 30, 1979, which is the two-year anniversary of the closing date. AlliedSignal also argues that the indemnity obligations are not "agreements," given that such an interpretation would conflict with the title of the provision, the intent of the parties as reflected in Section 3, and the course of performance of the parties. Item 20, p. 56.

It is clear, however, that Section 16 relates to the obligations of *both* purchaser *and* seller. Therefore, any purported indemnity liability assumed by *either* Buffalo Color *or* AlliedSignal pursuant to Sections 3(a)(2)(ii) or 3b would expire two years after the closing. Once the indemnity agreements have expired, the companies are left with statutory liability under CERCLA. Under the contract, neither Buffalo Color *nor* AlliedSignal can look to the other for contractual indemnification of their CERCLA liabilities. *See PMC, Inc. v. Sherwin–Williams Co.,* 151 F.3d 610 (7th Cir.1998); *Keywell Corp. v. Weinstein,* 33 F.3d at 165–66; *Southland Corp. v. Ashland Oil, Inc.,* 696 F.Supp. 994

(D.N.J.1988); *Mobay,* 761 F.Supp. at 357–58.

The court finds AlliedSignal's arguments concerning the title of the provision and the parties' subsequent course of conduct unpersuasive. Item 20, pp. 56–59. Allied-Signal has pointed out that the original draft of Section 16 was entitled "Survival of Representations, Warranties and Agreements" and subsequent drafts referred only to "Survival of Representations." AlliedSignal therefore concludes that the provision was not meant to apply to the contract's liability agreements. This argument is rejected, as the court looks to the actual text of the provision, not the title, to determine the parties' intent.

In sum, while Buffalo Color has successfully argued that AlliedSignal would assume liability for CERCLA costs under the contract, the limitation provision of Section 16 precludes relief on this cause of action.

#### d. Extrinsic Evidence

Lastly, although both parties have asserted that their particular interpretation of the contract is unambiguous, they also point to extrinsic evidence in support of their arguments. Given that the court has found that the terms in the Purchase Agreement are not ambiguous, and that they do evince the parties' intent, it is not necessary to consider the extrinsic evidence provided by either party.

#### e. Affirmative Defenses

##### 1. CERCLA Affirmative Defenses

AlliedSignal has asserted nineteen affirmative defenses. Item 2. The first fifteen affirmative defenses relate to the CERCLA cause of action. CERCLA, however, provides for only three defenses to liability under 42 U.S.C. § 9607(b)(3): there shall be no liability where the release of hazardous substances was caused solely by an act of God, an act of war, or the act or omission of a wholly unrelated third party. 42 U.S.C. § 9607(b).

A "strong majority of courts have held that liability under CERCLA § 9607(a) is subject only to the limited affirmative defenses" enumerated above. *Thaler v. PRB Metal Products, Inc.,* 815 F.Supp. 99, 101 (E.D.N.Y.1993) (citing cases). Therefore, to the extent that AlliedSignal's answer asserts affirmative defenses other than those set forth at 42 U.S.C. § 9607(b), they do not serve as defenses to liability and fail as a matter of law. This conclusion, however, "does not result in these defenses being stricken." *State of New York v. Almy Brothers, Inc.,* 971 F.Supp. 69, 73 (N.D.N.Y.1997). A number of these defenses may be raised during the contribution phase of the litigation. Concerning the CERCLA Affirmative Defenses (1–15), the court finds as follows:

Aff. Def. 1: Failure to state a cause of action. Based on the holdings above, this affirmative defense is dismissed in the liability phase; may be considered in apportionment phase.

Aff. Def. 2: Statute of limitations—Dismissed in its entirety. The CERCLA provisions apply here. Since the response actions are ongoing, the CERCLA claims cannot be untimely.

Aff. Def. 3: Waiver, estoppel, and latch—Dismissed in the liability phase; may be considered in apportionment phase.

Aff. Def. 4: Caveat emptor—Dismissed in the liability phase; may be considered in apportionment phase. *See Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 90 (3d Cir.1988).

Aff. Def. 5: Failure to mitigate damages—Dismissed in the liability phase; may be considered in apportionment phase.

Aff. Def. 6: Contributory negligence—Dismissed in the liability phase; may be considered in apportionment phase.

Aff. Def. 7: Superseding cause—Because liability on the part of AlliedSignal has been found, *supra* Section A(1), this affirmative defense is dismissed.

Aff. Def. 8: Proximate cause—Because liability on the part of AlliedSignal has been found, *supra* Section A(1), this affirmative defense is dismissed.

Aff. Def. 9: AlliedSignal exercised due care, took precautions against foreseeable acts/omissions of others and consequences resulting therefrom. This is a defense to liability enumerated in 42 U.S.C. § 9607. However, since the court has found that the disposal of hazardous substances by AlliedSignal's predecessors precludes it from claiming that the release of hazardous substances was caused "solely" by the acts of an unrelated third party, the court dismisses this affirmative defense.

Aff. Def. 10: Assumption of risk—Dismissed in the liability phase; may be considered in apportionment phase.

Aff. Def. 11: Divisibility of harm—Dismissed in the liability phase; may be considered in apportionment phase.

Aff. Def. 12: CERCLA § 107(a) precludes cost recovery claim—For the reasons articulated *infra* in Section C, this affirmative defense is not dismissed.

Aff. Def. 13: Costs incurred by plaintiff are inconsistent with NCP—Dismissed in the liability phase; may be considered in apportionment phase.

Aff. Def. 14: Failure to satisfy conditions precedent to recovery—Dismissed in the liability phase; may be considered in apportionment phase.

Aff. Def. 15: Failure to name indispensable parties—Dismissed in the liability phase; may be considered in apportionment phase.

### 2. *Contract Affirmative Defenses*

AlliedSignal asserts four contract affirmative defenses, 16–19.

Aff. Def. 16: Buffalo Color assumed liabilities under Section 3(a)(ii) of the contract. For the reasons discussed *supra* in Section II(B)(3), this affirmative defense is dismissed.

Aff. Def. 17: The time for Buffalo Color to bring claims expired under Section 16 of the contract. Since the court has decided that CERCLA, not the contract, controls there seems to be little merit to this motion. Nevertheless, at this stage for the reasons discussed *supra* in Section II(B)(3), the court denies Buffalo Color's motion to dismiss this affirmative defense.

Aff. Def. 18: The purchase agreement constitutes general release and indemnification. For the reasons discussed *supra* in Section II(B)(3), this affirmative defense is dismissed.

Aff. Def. 19: Satisfaction of claim resulting from discounted purchase price—Because the parties did not brief this point, the court will not dismiss this affirmative defense, and may consider it in the apportionment phase.

### C. *Summary Judgment on Plaintiff's First Cause of Action*

For the reasons given *supra* in footnote 1, the first cause of action is dismissed.

### *CONCLUSION*

For all the reasons articulated above, the court grants AlliedSignal's motion for partial summary judgment on Count I. The court denies Buffalo Color's motion for summary judgment on Count II, with leave to renew after further proceedings. Further, the court denies Buffalo Color's

motion for summary judgment on Count III.

The court dismisses AlliedSignal's second, seventh, eighth, ninth, sixteenth, and eighteenth affirmative defenses, and leaves the remainder for further proceedings.

So ordered.